IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **PATRICK TIMOTHY RICHARDSON,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | NO. 3:04-CV-1396-N |
| | § | |
| **DOUGLAS DRETKE, Director** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division** | § | |
| | § | |
| Respondent. | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

This case has been referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and a standing order of reference from the district court. The Findings, Conclusions and Recommendation of the Magistrate Judge are as follows:

**I. Procedural Background**

Petitioner filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. On May 7, 2000, Petitioner pled guilty to murder. *State of Texas v. Patrick Timothy Richardson*, No. F-0000766-NV (292nd Dist. Ct., Dallas County, Tex., May 7, 2000). The jury assessed punishment at sixty years imprisonment.

On August 1, 2002, the Thirteenth District Court of Appeals affirmed Petitioner's conviction. *Richardson v. State*, 83 S.W.3d 332 (Tex. App. – Corpus Christi 2002). On March 19, 2003, the Texas Court of Criminal Appeals denied Petitioner's petition for discretionary

review. *Richardson v. State*, P.D.R. No. 1702-02.

On December 22, 2003, Petitioner filed a state petition for writ of habeas corpus. *Ex parte Richardson*, Application No. 58,297-01. On March 31, 2004, the Court of Criminal Appeals denied the petition without written order.

On June 28, 2004, Petitioner filed this federal petition. He argues he was denied due process when his motion to recuse the trial judge was denied.

## II.  Factual Background

The following factual background is taken from the opinion of the Thirteenth District Court of Appeals.

> Richardson argues in issue seven that the trial court erred by denying his motion to recuse. He alleged the trial judge should have recused because his impartiality my reasonably be question or because he had a person bias or prejudice concerning the subject matter or a party. . . .
>
> The presiding judge of the First Administrative Region presided at the motion to recuse. Connie O'Neil, who recently had been president of the Junior League of Dallas, a volunteer organization of approximately 5600 members, testified that both the deceased and the judge's wife were members of the League and members of its leadership council. She indicated that the council, which consisted of 40-42 members, met seven or eight times between June 1, 1998, to May 31, 1999. While O'Neil could not say how many of those meetings were attended by the deceased and Judge Kristin Wade, the judge's wife, she testified that they worked together during those meetings on at least a few occasions. She characterized the meetings, which would last from forty-five minutes to as long as an hour and a half, as more a presentation and agenda than a gathering where everyone would visit with everyone else. O'Neil related that the deceased and Judge Kristin Wade did not serve on any other committee. The League president described both the deceased and Judge Kristin Wade as active members of the League. O'Neil also testified that on December 6, 1998, both Judge Henry Wade, Jr., the trial judge, and his wife and Richardson and the deceased had attended a party at her home. O'Neil identified several women as members or former members of the Junior League of Dallas.
>
> Judge Kristen Wade testified that she had known the deceased through the Junior League of Dallas, and that they both had served on the leadership council during the prior club year. She indicated that she would classify the deceased as more of an acquaintance than a friend. She said they knew each other by sight and exchanged pleasantries when

they saw each other. She related that they did not engage in personal conversation, but definitely engaged in Junior-League type conversation. She stated that she did not know such personal details as the number or names of the Richardson children. She acknowledge having talked to the deceased on occasions other than leadership council meetings and that their relationship was a little more than someone meeting for the first couple of times. She testified that she and the deceased attended most of the meetings of the leadership council. She acknowledged that because of the group's size it was sometimes hard to keep track as to who was there. Judge Kristin Wade testified that she recalled the deceased having been at the December 1998 party at the home of Connie O'Neil, and that although she could not recall Richardson being there, he probably was and it was likely that both she and her husband met him.

Judge Kristen Wade testified that a member of the Junior League called her the evening of the murder, telling her of the death and saying that she thought Richardson killed her. She related that at the time of the call, her husband, Judge Henry Wade, Jr., asked who had called, but she was too busy putting their children to bed to answer. She later told him that she had received a call from a friend informing her that another girl she knew had been killed. When her husband asked if he knew the deceased, she told him her name, but he again asked whether he knew her. Judge Kristin Wade indicated that she told him she did not know if he did or not. She stated that after seeing pictures of the deceased on the evening news, her husband stated that he did not recognize her. She acknowledged that she recognized the deceased.

Judge Kristin Wade testified she received several phone calls the next day after Richardson was released on bond, all from members of the Junior League. She related that the callers were unhappy, wanting to know how a bond works, how bond is set. She indicated that she might also have received calls the following day. She remembered that Connie O'Neil, the immediate past president of the Junior League, had called her at some point about the case. She recalled a total of about five or six calls. She said it would be a fair assessment that the callers were upset that Richardson was out on bond.

Judge Kristin Wade testified that on Monday, before getting the calls, while on their way to work, she asked her husband what he thought about the bond and he thought that the information on the news might have been incorrect in that it could have been a cash bond instead of a surety bond. She denied that they discussed whether the bond amount was set too high or too low.

Judge Kristin Wade testified that her husband had been in attendance with her at Junior League functions to which spouses were invited. She indicated that there were only one or two such events per year.

Judge Kristin Wade acknowledged that on Monday, the day after the murder, she contacted Judge King, the judge who had set Richardson's bond, and Ms. Dyer, an assistant district attorney, concerning the bond. She said both contacts were in the nature

of seeking information so that she could accurately answer the callers' questions and know where to refer them. She acknowledged that she was trying to direct her friends who were upset about the bond to Ms. Dyer so she could file a motion to raise the bond if she chose to do so. She insisted that Ms. Dyer had already filed such a motion at the time she talked to her. She again acknowledged that some of the callers were outraged about the bond.

Judge Kristen Wade acknowledged that she attended the deceased's funeral, which she indicated was attended by a lot of people, including members of the Junior League. She also indicated that the previous evening she had told her husband of her plans to attend the funeral. She related that she attended a reception after the funeral at the headquarters of the Junior League. She stated that the general consensus of those with whom she talked there was that they were outraged that Richardson was on bond. She recalled having spoken with O'Neil and two others. She subsequently testified that she did not really know that there was much conversation about the bond at the reception. She affirmed the fact that her husband knew from the news that there were some people outraged about the amount of the bond. She acknowledged that her husband was aware that she had attended both the funeral and the reception.

Judge Kristen Wade testified that she disagreed with the amount of the bond Judge King set, but that she did not relate that to him. She indicated that she and her husband did not ride together to work on the day the case was assigned to him. She related that she thought her husband already knew, before he was assigned to the case, that the State had already filed a motion to raise the bond.

Judge Kristen Wade acknowledged that several of those previously identified by O'Neil as being affiliated with the Junior League had made contributions to her March 1998 primary election campaign. She denied that any of them were among those who had called her. She said that she did not recall one of her campaign signs having been in the Richardson's yard, but that she would not be surprised if one had been there.

Judge Kristen Wade insisted that after the case was assigned to her husband she called the Junior League headquarters and talked "to Connie O'Neil and/or Helen Holman," telling them not to call her and not to have anyone else call her because she could not talk about the case anymore. She indicated that she received no more angry phone calls after that.

Judge Kristin Wade insisted that she only knew the deceased through the Junior League; that they had never been in each other's homes; that she had never had lunch with the deceased; and that she did not know the number or names of the deceased's children. She related that neighbors also asked her about the bond because of all the publicity about it. She said that she tried to distance herself from her husband regarding the case. She said she had received campaign contributions from people who were not in the Junior League, and that the deceased, to her knowledge, had not contributed to either

her or her husband's campaign.  She acknowledged that someone could contribute to a campaign in non-monetary ways, such as having a yard sign in their yard.  She said that she did not think that she had ever discussed with her husband that their neighbors were unhappy with the bond situation.

Judge Henry Wade, Jr., the trial judge, testified that he is the husband of Judge Kristin Wade.  He indicated that on the night of the murder he learned from his wife of the murder and that the deceased had been a member of the Junior League.  He said that he learned, before the case was assigned to him, that his wife had received calls from someone in the Junior League who was unhappy about the bond situation.  He related that he might have met the Richardsons at the party at the home of O'Neil, but that he did not recall it.  He denied knowing any of the deceased's family.  He said he was aware that his wife knew the deceased through the Junior League, but was not aware that it was through the leadership council.

Judge Henry Wade, Jr., testified that he was aware that his wife had attended both the funeral and the reception and he (sic) that he recalled a conversation that occurred before he took over the case about someone in the Junior League being unhappy about the bond.  He indicated he was "kind of" aware that it was more than one person, although he was not aware of specific names.  He related that when Ms. Dyer presented him with a motion to raise the bond prior to the case being assigned to him, as a matter of courtesy he discussed the matter with Judge King as to what he should do and they agreed he would do nothing.  He acknowledged having seen press reports concerning public outrage about the amount of the bond.  He said that his wife let him know she disagreed with the amount of the bond.  He acknowledged that the morning the case was assigned to him he granted a State's motion to declare Richardson's bond insufficient and raised it from $30,000 to $1,000,000, in the absence of Richardson's attorney and without a hearing, although he knew Richardson was represented by counsel.  He related that it was represented to him that a copy of the motion had been faxed to Richardson's attorney.

Judge Henry Wade, Jr., testified that he only knew his wife's Junior League friends casually.  He said he did not know the deceased, was not a friend of hers or of Richardson, and the fact that the deceased and his wife had both been members of the Junior League would not influence his decision in the case.

. . . .

*Richardson v. State*, 83 S.W.3d 332, 354-358 (Tex. App. – Corpus Christi 2002).

**Findings, Conclusions and Recommendation**
**of the United States Magistrate Judge**          Page -5-

### III.  Discussion

**1.    Standard of Review**

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), 28 U.S.C. § 2254 provide:

> (d)    An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

*See* 28 U.S.C. § 2254(d).  Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 380-84 (2000).  Under the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  *Id*.

This amendment applies to all federal habeas corpus petitions which are adjudicated on the merits in state court after April 24, 1996.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The petition in this case is subject to review under the AEDPA.

**2.     Motion to Recuse**

Petitioner argues he was denied due process when his motion to recuse Judge Wade was denied.  He argues Judge Wade was actually biased against him, and that there was an appearance of bias that violated his due process rights.

Under the Due Process Clause, a criminal defendant is guaranteed the right to a fair and impartial tribunal.  *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997); *Nethery v. Collins*, 993 F.2d 1154, 1157 (1993).  The Due Process Clause establishes a constitutional floor, not a uniform standard.  *Bracy*, 520 U.S. at 904-05.  This floor "clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case."  *Id*. at 905 (citation omitted).  Further, "adjudication before a biased trial judge falls within the 'very limited class of cases' that represent 'structural' error subject to automatic reversal."  *Bigby v. Dretke*, 402 F.3d 551, 559 (5th Cir. 2005), *cert. denied*, 126 S.Ct. 239 (2005) (quoting *Neder v. United States*, 527 U.S. 1, 7-8 (1999)).

To establish a due process violation, a petitioner must show that a genuine question exists regarding the judge's impartiality.  *Bigby*, 402 F.3d at 559, (citing *Liteky v. United States*, 510 U.S. 540, 552 (1994)).  The Court must determine whether the "situation is one 'which would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true.'"  *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986) (quoting *Ward v. Village of Monroeville*, 409 U.S. 5760 (1972).

The Supreme Court has stated, however, that "most matters relating to judicial disqualification [do] not rise to a constitutional level."  *Aetna*, 475 U.S. at 820 (quoting *F.T.C. v. Cement Institute*, 333 U.S. 683 (1948)).  Further, courts ordinarily "presume that public officials

**Findings, Conclusions and Recommendation
of the United States Magistrate Judge**          Page -7-

have properly discharged their official duties." *Bracy*, 520 U.S. at 909 (internal quotation marks and citations omitted). Therefore, "bias by an adjudicator is not lightly established." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1052 (5th Cir. 1997).

The Supreme Court's cases requiring disqualification have all involved "direct, personal [and] substantial" influences on the judges involved. *Aetna*, 475 U.S. at 822 (quoting *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)). In *Tumey*, the judge in a criminal case was paid only if the defendant was convicted. *Tumey*, 273 U.S. at 520. In *Aetna*, Justice Embry of the Alabama Supreme Court cast the deciding vote and wrote the majority opinion in a case establishing a legal proposition that "had the clear and immediate effect of enhancing both the legal status and settlement value" of two pending cases Justice Embry had filed as a plaintiff. *Aetna*, 475 U.S. at 822-24.

In *Ward v. City of Monroeville, Ohio*, 409 U.S. 57 (1972), the Court held that the mayor of Monroeville could not sit as a judge in traffic court. The mayor was responsible for the town's finances and revenue production. Monroeville derived a major part of its income from fines and other costs imposed in the court. The Court found that the mayor's responsibility for town finances "may make him partisan to maintain the high level of contribution from the mayor's court." *Id.* at 60.

The Supreme Court has also required disqualification because of a party's direct personal insults to a judge. In *Mayberry v Pennsylvania*, 400 U.S. 455 (1971), the defendant called the judge a "dirty [S.O.B.]," a "dirty tyrannical old dog," and a "fool," and told the judge to "Go to hell." *Id*. at 466. The Supreme Court held that the judge could not preside over the defendant's subsequent contempt trial.

**Findings, Conclusions and Recommendation
of the United States Magistrate Judge**          Page -8-

In *In re Murchison*, 349 U.S. 133 (1955), the Court held that due process is violated where a judge acts as both a prosecutor and a judge in the same case. In that case, a state court judge acted as a "one-man grand jury" investigating police corruption. Two witnesses testified before the judge in his role as grand juror. Based on their testimony, the judge believed the two witnesses had committed contempt. The judge then charged the two witnesses with contempt and later tried and convicted them. *In re Murchison*, 349 U.S. at 134-35. The Supreme Court held that a trial before the same judge who brought the contempt charges violated the defendants' right to due process. *Id.* at 137-139.

The United States Supreme Court, therefore, has found that decision makers are constitutionally unacceptable when: (1) the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) a judicial or quasi judicial decision maker has the dual role of investigating and adjudicating disputes and complaints. *Bigby*, 402 F.3d at 559 (citations omitted).

On the other hand, not all "possible temptations" towards bias require that a judge be recused. In *Aetna*, the Court held that Justice Embry's general frustration with insurance companies did not require him to recuse. *Aetna*, 475 U.S. at 820-21. Additionally, six other state justices in *Aetna* were Blue Cross insurance subscribers and could have been part of a then-pending class action against Blue Cross. The Court found that these justices had no knowledge of the class action at the time of the decision, although they did know of the action when they denied the motion for rehearing. The Court found that such an interest was not sufficiently "direct, personal, substantial [and] pecuniary" to require recusal. *Id.* at 826 (citations omitted).

**Findings, Conclusions and Recommendation**
**of the United States Magistrate Judge**          Page -9-

(A) Actual bias

In this case, Petitioner argues that Judge Wade was required to recuse for actual bias under "*Tumey* and its progeny." (Pet. Memo at 13). In *Tumey*, as discussed above, the judge in a criminal case was paid only if the defendant was convicted. *Tumey*, 273 U.S. at 520. The interest in *Tumey*, therefore, was a pecuniary interest. Petitioner claims that, in this case, although the "interest is not pecuniary gain it was certainly well within that type of interest contemplated by *Ward*." (Pet. Mem. at 13). In *Ward*, discussed above, the Supreme Court held that the mayor of Monroeville could not sit as a judge in traffic court. *Ward*, 409 U.S. at 60. The Court found that the mayor's responsibility for town finances "may make him partisan to maintain the high level of contribution from the mayor's court." *Id*. Petitioner does not identify the interest that Judge Wade allegedly had in Petitioner's punishment trial, nor does he explain how Judge Wade's presiding over the punishment trial was "within the type of interest contemplated by *Ward*."

Petitioner does, however, object to certain evidentiary rulings made by Judge Wade. The Court must examine Petitioner's claims for a showing of actual bias. *Bigby*, 402 F.3d at 560. Petitioner argues Judge Wade showed bias in overruling defense objections to certain testimony. To establish that Judge Wade was actually biased, Petitioner must show that Judge Wade was "acting clearly outside the bounds of law or reason in a manner that would signal any bias toward the defendant." *Id*. at 563.

1. Evidentiary rulings upheld on direct appeal

Petitioner argues the following evidentiary rulings establish Judge Wade's bias. First, Petitioner states the prosecutor asked the state's psychiatrist, Dr. Benedek, to give her opinion

whether the killing resulted from sudden passion arising from an adequate cause. (Trial Tr. Vol. 10, at 84, 112). Defense counsel objected, arguing that Texas Rule of Evidence 704 does not allow a witness to testify to an ultimate issue. Judge Wade overruled the objection.

Texas Rule of Evidence 704 states: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." On direct appeal, the court rejected Petitioner's claim, finding that the question "embraced the ultimate issue to be decided but did not answer the ultimate issue for the jury." *Richardson*, 83 S.W.3d at 350.

In Petitioner's second claim, Dr. Benedek testified that one of the reasons Petitioner murdered his wife was jealousy and jealousy regarding money. (Trial Tr. Vol. 10 at 83-84). Dr. Benedek stated her opinion was based in part upon statements one of the children made to her that his father was jealous of his mother, and that his mother had more money. (*Id*. at 62, 99-100). Defense counsel objected that Dr. Benedek's testimony was inadmissible hearsay under Texas Rule of Evidence 703. (*Id*. at 84). On direct appeal the court rejected Petitioner's claim. The court stated:

> Rule 703 of the Texas Rules of Evidence provides that facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by, reviewed by, or made known to the expert at or before the hearing, and that if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

*Richardson*, 83 S.W.3d at 351. The court therefore found that Judge Wade properly overruled Petitioner's hearsay objection.

Petitioner has failed to show that Judge Wade's rulings were outside the bounds of law or reason. In fact, Petitioner states the rulings were "within the zone of reasonable disagreement."

**Findings, Conclusions and Recommendation
of the United States Magistrate Judge**          Page -11-

(Pet. Mem. at 11). Such a showing is insufficient to support a finding of actual bias.

    2.    <u>Evidentiary rulings found improper on appeal</u>

Petitioner raises two evidentiary rulings that the appellate court found were improper. In the first ruling, Dr. Benedek testified that one of the children told her his mother was "tackled" by his father just prior to the murder. (Trial Tr. Vol. 10 at 111). Petitioner raised a hearsay objection, which Judge Wade overruled. (*Id*.) The appellate court found that defense counsel's objection should have been sustained. *Richardson*, 83 S.W.3d at 352. The court, however, found the same testimony was later admitted without objection. It therefore overruled Petitioner's claim. (*Id*.)

In the second ruling, the court considered testimony from the deceased's brother, Robert Williams. Williams testified that on the Thursday before the murder, the deceased told him that her main concern was what Petitioner would do to her and the children after the divorce. (Trial Tr. Vol. 10 at 79). Defense counsel objected that the testimony was hearsay and Judge Wade overruled the objection. (*Id*.) The court of appeals found that the trial court abused its discretion in overruling the objection, but found that:

> Given all of the evidence in this case, including the fact that it is undisputed that Richardson brutally murdered the deceased in front of their children, we hold beyond a reasonable doubt that any error in admission of the deceased's concern as to what Richardson might do to her and the children did not contribute either to his conviction or his punishment.

*Richardson*, 83 S.W.3d at 353.

The Court finds these two instances of hearsay evidence do not establish that Judge Wade was actually biased against Petitioner. Petitioner has not shown that Judge Wade was "acting clearly outside the bounds of law or reason in a manner that would signal any bias toward the

defendant." *Bigby*, 402 F.3d at 563. He has also failed to show that a genuine question exists as to Judge Wade's impartiality. The Court finds Petitioner's due process claims based on actual bias should be denied.[1]

(B) The Appearance of Bias

Petitioner argues that Judge Wade's failure to recuse created the appearance of bias, which violated his due process rights. To support his claim, Petitioner cites the state appellate court's finding that:

> Richardson has produced undisputed evidence that would show that a reasonable member of the public, knowing all the circumstances involved, would have questions or doubts as to the impartiality of the trial judge.

*Richardson*, 83 S.W.3d at 358-59. He argues that once the state court found this appearance of bias, it should have found structural error and reversed the sentence. *See Bigby v. Dretke*, 402 F.3d at 559 ("adjudication before a biased trial judge falls within the 'very limited class of cases' that represent 'structural' error subject to automatic reversal.") (citation omitted). Instead, the court applied a harmless error analysis and denied relief.

Although the appellate court correctly analyzed Petitioner's claims under state law, it did not address Petitioner's claims under the federal Due Process Clause.[2] The Due Process Clause "may sometimes bar trial by judges who have no actual bias and who would do their very best to

---

[1] The appellate court's finding regarding actual bias states: "Our opinion does not constitute a finding that there was any actual bias, prejudice, or partiality on the part of Judge Henry Wade, Jr." *Richardson*, 83 S.W.3d at 359. It is unclear whether the court found that Judge Wade was not actually biased, or whether the court made no finding as to this issue. Under either the AEDPA deferential review standard, or a *de novo* review, however, the Court concludes there was no showing of actual bias.

[2] The Court notes that Petitioner did not clearly raise a federal due process claim on direct appeal. He did, however, raise this claim in his motion for rehearing, petition for discretionary review and on state habeas review.

**Findings, Conclusions and Recommendation
of the United States Magistrate Judge**     Page -13-

weigh the scales of justice equally between contending parties." *Aetna*, 475 U.S. at 825. As the Fifth Circuit has stated, however, a trial judge with no actual bias may be barred "[s]ometimes, of course, but not always." *United States v. Couch*, 896 F.2d 78, 82 (5th Cir. 1990).

In *Couch*, the Fifth Circuit analyzed whether an appearance of judicial bias, without a claim of actual bias, stated a claim for habeas relief under 28 U.S.C. § 2255. In that case, the petitioner brought a claim under the Due Process Clause and the federal recusal statute found at 28 U.S.C. §455.

The Court stated that the Due Process Clause and section 455 are not coterminous. *Couch*, 896 F.2d at 81. Section 455, like the standard used by the state appellate court in this case, requires disqualification when others would have reasonable cause to question the judge's impartiality. *Id*. at 82. The Due Process Clause, however, "requires a judge to step aside when a *reasonable judge* would find it necessary to do so." *Id*. (emphasis added). The Court therefore stated:

> [S]ection 455 establishes a statutory disqualification standard more demanding than that required by the Due Process Clause. (citations omitted).
>
> . . . .
>
> Section 455 requires disqualification when others would have reasonable cause to question the judge's impartiality. It is this additional, systemic concern for avoiding the appearance of impropriety that makes the section 455 standard for disqualification more demanding than that imposed by the Due Process Clause.

*Id*. at 81-82.

In this case, therefore, the appellate court applied a state recusal standard that was more expansive than that required by the Due Process Clause. Since this state law is contrary to clearly established federal law, the state court's decision finding an appearance of impropriety is

not entitled to deference under the AEDPA. 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 380-84.

Applying the federal due process standard, the Court finds no appearance of bias sufficient to violate the Due Process Clause. The Court finds that a reasonable judge would not have found it necessary to recuse under the facts of this case. Further, Petitioner has shown no interest sufficiently direct, personal, substantial or pecuniary to require recusal. Petitioner has failed to show a violation of his due process rights. He has therefore failed to establish that his trial "falls within the 'very limited class of cases' that represents a 'structural' error subject to automatic reversal." *Bigby*, 402 F.3d at 559 (citation omitted).

**RECOMMENDATION**

This Court recommends that the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 be DENIED.

Signed June 29, 2006.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO OBJECT**

The United States District Clerk shall serve a copy of these findings and recommendations on the parties. Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to these findings and recommendations must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings and recommendations to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. The failure to file such written objections to these proposed findings and recommendations shall bar that party from a *de novo* determination by the district court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, the failure to file written objections to proposed findings and recommendations within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).